Filed 3/3/25  P. v. Oldham CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAMARR MARQUIS OLDHAM,<br><br>    Defendant and Appellant. | F086767<br><br>(Super. Ct. No. 1466458)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Robert B. Westbrook, Judge.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Petitioner Lamarr Marquis Oldham petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder. The trial court held an evidentiary hearing and denied the petition on the ground petitioner was a major participant in the underlying robbery who acted with reckless indifference to human life.

On appeal, petitioner contends substantial evidence does not support the court's findings that he was a major participant in the robbery who acted with reckless indifference to human life. We affirm.

# FACTUAL BACKGROUND

We summarize the factual record considered by the trial court at the evidentiary hearing, which consisted of live witness testimony, an excerpted copy of the preliminary hearing transcript,[2] and a transcript of petitioner's change of plea hearing.

On December 11, 2013, R.R.[3] and Damian Villavicencio went to the parking lot of a restaurant in Modesto to sell marijuana to petitioner's codefendant, Isaiah Stafford. Petitioner also was present in the restaurant parking lot, as was Stafford's girlfriend, Luisa. During the encounter, Villavicencio was fatally shot in the back. R.R. was shot in the right forearm but survived.

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[2] In advance of the evidentiary hearing, the People submitted an excerpted copy of the preliminary hearing transcript to the court. It appears the People attempted to remove from the transcript hearsay that would be inadmissible pursuant to section 1172.6, subdivision (d)(3). A complete copy of the preliminary hearing transcript is not contained in the record on appeal.

[3] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

## I.    Evidentiary Hearing Testimony

### A.    Luisa

Luisa testified at the evidentiary hearing that, on the morning of the shooting, she went with Stafford to a store to purchase bullets.  That evening, she saw Stafford standing in the restaurant parking lot.  She spoke with Stafford, who pointed out petitioner standing in the distance near a dumpster.  Stafford said he was "about to come up," which Luisa understood to refer to either a robbery or getting something for less than it was worth or close to free.  He had a gun in his waistband.

A car pulled into the parking lot with two boys in it.  Stafford got into the rear passenger seat.  Stafford kept the door open and his feet outside of the car.  Luisa stood a few feet outside the car.  Stafford's body was facing her, but his face was facing forward.  Luisa did not see anyone with any money.  The boys and Stafford "look[ed] at each other kind of like strange; and then the two boys started looking at each other," then looking at Luisa and Stafford.  The car started driving forward, then backward, before it appeared to get stuck on a curb or ledge in the parking lot.  The tires of the vehicle spun as Stafford got out of the car.  Luisa saw three or four flashes.  She was not sure whether Stafford started shooting from inside or outside the car, but thought he was still in the vehicle.  He continued shooting while outside the passenger side of the car.  Petitioner walked up to the driver's side of the car and Luisa heard "really loud shots" and saw that petitioner also was shooting from a crouched position.  She heard four or five shots but could not be sure of the number because Stafford also was shooting.  She believed petitioner was shooting in the air.

Stafford ran in one direction and Luisa and petitioner ran in another direction.  At some point, they came together and all went to an apartment where petitioner lived, which was "right behind" the restaurant.  Petitioner and Stafford washed their hands with cleaning products in the bathroom.  Eventually, Luisa and Stafford left, walking behind

3.

the apartments. Stafford tossed his gun on top of a building and Luisa threw away his jacket. They then climbed over a wall and were apprehended by police.

### B.    R.R.

R.R. testified at the evidentiary hearing that he and Villavicencio went to the restaurant parking lot to sell Stafford two ounces of marijuana for about $200. R.R. drove to the parking lot in his mother's car, with Villavicencio in the front passenger seat. R.R. was unarmed. Once they arrived, R.R. saw Stafford with a girl R.R. did not recognize. R.R. put the car in park; Stafford got into the right rear passenger seat and left the door open. R.R. asked Stafford about the money and he "started acting weird." R.R. put the car in reverse to get out of there and, when the car got stuck on the curb, Stafford fell out. R.R. then heard gunshots. R.R. exited from the passenger side of the car and took off running. He did not know where the shots came from. He believed he heard three shots. Stafford was either out of the car or on his way out of the car when the first shot went off.

R.R. was shot in the right arm near his wrist. He did not know at what point he was shot. He did not see anyone in the parking lot besides Stafford and the woman. He did not receive any money from Stafford and did not give him any marijuana.

### C.    Sergeant S. Martin

Modesto Police Sergeant S. Martin testified at the evidentiary hearing that he was an investigator at the time of the shooting and was assigned as the lead homicide detective on the case. He interviewed R.R. at the hospital the night of the shooting and observed that R.R. had a "through-and-through gunshot wound to his right forearm." Martin observed R.R.'s cell phone and determined that R.R. had been contacted by a phone number Martin later determined was associated with petitioner.

R.R. told Martin that he went to the restaurant parking lot to sell marijuana to Stafford. R.R. had communicated with Stafford through Facebook Messenger and the aforementioned cell phone number associated with petitioner. R.R. told Martin that

4.

Stafford was with an unknown female in the parking lot. Stafford got into the right rear passenger seat of R.R.'s car, but his feet were outside of the car and Stafford was not fully facing forward. This caused R.R. some concern. Stafford asked to see the marijuana and R.R. stated that he wanted to see the money. The two again debated showing the money or the marijuana and Stafford reached toward his pocket or waistband. R.R. noticed another person creeping up on the passenger side of the car with his hands in his pockets. Villavicencio made a comment that caused R.R. to accelerate away and make a U-turn, which caused the car to get stuck on a curb. When the car hit the curb, Stafford fell out. At approximately the same time, Villavicencio exited the car, R.R. heard two gunshots, and R.R. saw what appeared to be the barrel of a revolver in Stafford's hand. R.R. believed the other person outside the car also was shooting, and gunshots were coming from outside the vehicle while R.R. was inside. R.R. believed he was shot while still inside the car.

## II. Preliminary Hearing Testimony

### A. Autopsy

A forensic pathologist testified that Villavicencio had a single bullet entrance wound to his left back, with gunpowder around the bullet hole. The gunpowder suggested that the bullet was fired at "very close range," with the gun pressing into Villavicencio's back. The bullet traveled through Villavicencio's body in an upward direction, toward the center of his body, and exited his left chest. Villavicencio's cause of death was a gunshot wound to the back causing loss of blood. However, the nature of the bleeding was such that a person with this injury could survive, and even be able to run, for a little while after the shooting.

### B. Firearms Recovered

On the night of the shooting, officers received information that led them to an apartment associated with petitioner in a complex near the shooting. In the apartment, they found a .40-millimeter Glock 22 pistol. The pistol had a high-capacity magazine

capable of holding 15 rounds. One round was in the chamber and nine were in the magazine, suggesting five rounds had been fired. Near the pistol, officers also found another magazine with a 30-round capacity, a box capable of holding 50 rounds of .40-millimeter ammunition with 15 rounds remaining inside, a full box of Winchester ammunition with 50 rounds, the barrel for a Glock .357 Magnum, four rounds of .45-caliber ammunition, and one round of Ruger nine-millimeter ammunition. In the dumpsters of the apartment complex, officers found a jacket.

Approximately one month after the shooting, law enforcement received information that led them to the rooftop of a building in the apartment complex. On the roof, officers discovered a .357 Ruger revolver with no rounds in the chamber.

### C.   Ballistics and Other Evidence

When officers arrived on scene, they observed the vehicle stuck on a curb, with apparent bullet holes in it. The front and rear right passenger side doors were open.

There were two bullet holes in the left rear door of the vehicle. One of these bullets traveled through the left rear driver's side door, through the right front passenger seat, and into the right passenger door. The other traveled through the left rear driver's side door and into the rear passenger side door. Both expended bullets were retrieved from the passenger side door. A .40-caliber bullet fragment was pulled from the left driver's side pillar, between the front and rear doors. All three bullets were consistent with having been fired from the Glock, but not the .357 revolver. However, law enforcement could not say with certainty that the bullets were fired from the Glock.

A bullet hit the vehicle's left rear rim. Bullet fragments taken from the rim had no significant forensic information with which to determine the weapon from which they were fired.

A .38-caliber expended bullet was found on the left driver's side rear floorboard. There was blood on the front passenger seat backrest and seat cushion.

A .40-caliber bullet jacket was found on the sidewalk, north of the parking lot and to the rear of the vehicle. Three .40-caliber expended Smith & Wesson shell casings were found in the restaurant parking lot. All three shell casings were fired from the Glock. Law enforcement determined the Glock was fired from outside of the driver's side of the vehicle, toward the rear of the vehicle.

After Stafford was transported to the police station, officers found two .38-caliber spent shell casings in his left pocket. Law enforcement subsequently determined that these shell casings were fired from the .357 revolver.

### D.     Petitioner's Statements

Petitioner was interviewed on the night of the shooting and initially denied any involvement in the homicide. He later confirmed that he met up with Stafford, who he identified as his cousin, and accompanied him to the restaurant where the shooting took place. Stafford used petitioner's phone to call someone to meet them to purchase marijuana at the restaurant. Stafford's girlfriend was with them while they waited.

Petitioner reported that, when the car pulled up, Stafford got into the rear passenger side of the vehicle. Petitioner waited across the street, but eventually approached the vehicle to get his phone back. As petitioner crossed the street, a shot was fired inside the car. Petitioner got within five feet of the vehicle and fired a warning shot in the air. He then stated that he fired twice into the passenger compartment of the vehicle using a .40-caliber Smith & Wesson semiautomatic handgun. The car accelerated at a high rate of speed and crashed. Stafford, his girlfriend, and petitioner ran from the scene. Petitioner stated he thought Stafford was the first to fire, hitting the front passenger of the vehicle. Petitioner did not see anyone shooting from inside the vehicle or shooting at him. Petitioner denied living in the nearby apartment.

Petitioner agreed to take officers to the location where the gun was located. Petitioner led officers to an empty field, but no gun was located. Petitioner then told officers to check the trash cans at the apartment complex, which they did. Petitioner at

one point stated he would not reveal the gun's location until after the victim's autopsy and a determination of which bullet killed the victim. Officers told petitioner there were no .40-caliber bullets found inside the victim's body and petitioner then directed the officers back to the apartment complex, where petitioner reported he threw the gun over a fence into a yard. Again, no gun was located. At another point, petitioner admitted to running away from the apartment with both the Glock and the revolver.

### III. Plea Allocution

In relation to his plea to first degree murder, petitioner was required to "state an allocution . . . and . . . admit the facts contained in the allocution." In his allocution, petitioner stated:

> "I, Lamarr Oldham, understand that I am currently charged with first degree murder under the theory of the felony murder rule.

> "On or about December 11, 2013, at the age of 23, I was with Isaiah Stafford in Modesto, California, [C]ounty of Stanislaus. We discussed the purchase of marijuana.

> "Mr. Stafford had a friend who he contacted and set up a buy for approximately $250 worth of marijuana. I was aware at the time that he set up the purchase that neither he nor I had the $250 to make the purchase. I knew Mr. Stafford was going to attempt to rob him for the marijuana. I agreed to go with him and aid and abet in his plan.

> "I did, in fact, go in his company and the company of Luisa [R.] in the parking lot of [the restaurant]. I knew that Mr. Stafford had a loaded firearm, and I had a loaded firearm.

> "I was present when [R.R.] and Damian Villavicencio arrived in their vehicle. I was present when Mr. Stafford approached the vehicle and got in the backseat. I was present when Mr. Stafford in the commission of the attempted robbery shot inside the vehicle and caused the death of Mr. Villavicencio.

> "I agree that there's a logical connection between the act of Mr. Stafford firing his gun fatally wounding Mr. Villavicencio and the commission of the attempted robbery.

"In addition, I fired my gun at the scene. I admit that the act of setting up the marijuana purchase intending to get the marijuana through a show of force, especially being armed with guns, constitutes an attempted robbery."

## PROCEDURAL HISTORY

In 2015, petitioner and Stafford were charged by information with murder (§ 187, subd. (a)); count I), assault with a firearm (§ 245, subd. (a)(2); count II), and two counts of attempted robbery (§§ 211, 664; counts III and IV). As to count I, the information alleged the special circumstance that the murder occurred during an attempted robbery (§ 190.2, subd. (a)(17)). As to count II, the information alleged petitioner personally used a firearm (§ 12022.5, subd. (a)). As to counts I, III, and IV, the information alleged petitioner personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

In 2018, petitioner pled no contest to first degree murder in count I and admitted a lesser firearm enhancement pursuant to section 12022.53, subdivision (b). The remaining charges were dismissed and, in 2020, petitioner was sentenced to an agreed-upon term of 35 years to life.

In 2022, petitioner filed a petition for resentencing pursuant to section 1172.6.[4] The court appointed counsel to represent him. The court determined petitioner set forth a prima facie claim for resentencing and set the matter for an evidentiary hearing.

The evidentiary hearing was conducted on July 27, and July 28, 2023. On August 17, 2023, the court issued a written order denying the petition. The court stated it had considered petitioner's plea allocution and nonhearsay witness testimony from the preliminary hearing transcript. The court found petitioner was a major participant in the attempted robbery based on the following:

---

[4] It appears this was petitioner's second petition for resentencing. The first petition was filed on November 30, 2020, and denied on January 4, 2021, based on "the allocution that was part of [his] plea of guilty . . . and the facts to which he admitted," which the court found "rebut[ted] his claim that he was not a major participant."

"His plea allocution establishes that he knew of the plan to rob [R.R.], and that he agreed to aid and abet Mr. Stafford. He assisted Mr. Stafford by allowing him to use his phone to set up the buy. He accompanied Mr. Stafford to the [restaurant] parking lot where the transaction was to take place, knowing Mr. Stafford was armed. [Petitioner] also brought his own firearm to the scene.

"At the scene, [petitioner] was not in a position to prevent Mr. Stafford from firing his weapon. As [Luisa] described the events: 'It happened so quick.' When [R.R.] arrived with Mr. Villavicencio, they stopped their vehicle next to Mr. Stafford and [Luisa]. According to [Luisa], Mr. Stafford sat in the backseat, with the door open, and his feet on the ground outside the car. [Petitioner] was also present, but some distance away from the car. [Luisa] described him as being 'far away' by a light post, or a dumpster.

"After it became apparent to [R.R.] that the transaction was not proceeding as expected, he became spooked and tried to drive away. As he accelerated, [R.R. (*sic*)] fell out of the car as shots were fired. While [petitioner] was not in a position to prevent the first shots fired by Mr. Stafford, his subsequent actions elevated his status from 'mere' parti[ci]pant to 'major' participant. By the time the first shots were fired, [petitioner] had approached the driver's side of the vehicle, and began firing his own weapon into the car.

"Taken together, The Court finds that [petitioner's] participation was of sufficient significance to be considered 'major' according to the factors set forth in [*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)]."

The court then found the evidence established petitioner acted with reckless indifference to human life, based on the following:

"[E]vidence in the record establishes that [petitioner] had knowledge that Mr. Stafford was armed going into this transaction. He himself was also armed. While physically present at the scene he had no opportunity to restrain Mr. Stafford, as he was some distance away. Nor was he in a position to aid the victims, as they fled when Mr. Stafford commenced shooting. It does not appear that [petitioner] had any interest is [*sic*] providing aid . . . to the victims, however, as he himself began firing into their car.

"There is perhaps no greater expression of a willingness to kill, or to assist another in doing so, than intentionally firing your weapon during the commission of the crime. While there was some suggestion that

10.

[petitioner] first fired a warning shot, there is ample evidence that the rest of his shots were fired into the driver's side of the vehicle. His actions clearly demonstrate a willingness to participate in the violent manner in which the crime was committed.[5]"

On that basis, the petition was denied.

## DISCUSSION

### I.    Section 1172.6 Procedure

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the

---

**5** "During the argument, this Court inquired as to whether the timing of [petitioner's] actions should be a factor in the inquiry. The Court's discomfort is deepened by a review of the evidence contained in the Preliminary Hearing Transcript. The pathologist testified that death was due to a contact gunshot wound to Mr. Villavicencio's back. This suggests that the fatal shot was the *first* shot fired before Mr. Stafford was ejected from the backseat of the vehicle, and before [petitioner] began firing. While [petitioner's] actions subsequent to the first shot being fired, demonstrate a reckless indifference to human life, they do not appear to have been a causal factor in Mr. Villavicencio's death. However, a close reading of *Banks*, *supra*, implies only the need for a nexus between recklessly indifferent *actions* and an awareness of the *risk* to human life they create.

"The Court takes further guidance from other appellate court decisions, where the reckless indifference was displayed *after* the fatal wounds were inflicted. (See, for example, *People v. Mitchell* (2022) 81 Cal.App.5th 575.)"

natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to

12.

determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

## II.    Sufficient Evidence of Felony-murder Liability

The trial court found petitioner was ineligible for resentencing because the prosecution had proved beyond a reasonable doubt that he was guilty of murder as a major participant in a qualifying felony who acted with reckless indifference to human life.  Petitioner contends these findings are not supported by substantial evidence.  We disagree.

### A.    Applicable Law Regarding Felony Murder

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  Relatedly, section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . .  For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court sought to clarify the circumstances under which "an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.)  The high court identified the following nonexhaustive factors as relevant to this inquiry:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal

13.

weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)  However, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid.*)

The following year, in *People v. Clark* (2016) 63 Cal.4th 522, 614–623 (*Clark*), the high court addressed the "reckless indifference" standard.  The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Id.* at p. 617.)  The court further explained that reckless indifference to human life has both a subjective and an objective component.  (*Ibid.*)  Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.)  Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' "  (*Clark*, at p. 617.)  That a felony involves a gun is insufficient, by itself, to support a finding of reckless indifference.  (*Id*. at pp. 617–618.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims, (4) the

defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Notably, *Banks* and *Clark* derived their holdings from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the prevailing Eighth Amendment jurisprudence regarding the circumstances under which the death penalty permissibly may be imposed for felony murder. (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393.) Our Supreme Court has explained that *Enmund* and *Tison* together establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and had no culpable mental state at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) We briefly describe the facts of *Enmund* and *Tison* to give context to this spectrum.

The defendant in *Enmund* was a getaway driver for a robbery. He sat waiting in his parked car a few hundred feet away from the home where his two confederates fatally shot an elderly couple when they resisted. (*Enmund*, *supra*, 458 U.S. at p. 784.) The high court emphasized the defendant "did not kill or attempt to kill," and the record did not support a finding he had "any intention of participating in or facilitating a murder." (*Id*. at p. 798.) As such, imposition of the death penalty, which must be based solely on a defendant's own culpability, was constitutionally disproportionate. (*Ibid*.)

The facts of *Tison* are starkly different. There, two brothers helped their father and his cellmate—both convicted murderers—escape from prison, arming the prisoners during their escape. (*Tison*, *supra*, 481 U.S. at pp. 139, 150–152.) When the group eventually experienced car trouble, one of the brothers flagged down a passing car for help while the other men laid in wait by the side of the road. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint a family of four in the passing car, robbed them, and

drove them into the desert. (*Id.* at p. 140.) The brothers stood by while their father and his cellmate shot the victims repeatedly. The group then left the family to die in the desert and drove off in the family's car. (*Id.* at pp. 139–141.) The high court emphasized that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." (*Id.* at pp. 157–158.) The high court noted the brothers' substantial and active participation in the kidnapping and robbery implicated them in the resulting deaths, and the death penalty could properly be imposed under such circumstances where the defendants also exhibited reckless indifference to human life. (*Id.* at p. 158.)

Our Supreme Court has explained that, "[s]omewhere between [*Tison* and *Enmund*], at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

### B. Major Participation

Petitioner contends substantial evidence does not support a finding that he was a major participant in the underlying attempted robbery that led to Villavicencio's death. We disagree. Substantial evidence of several *Banks* factors supports the trial court's determination that petitioner was a major participant in the attempted robbery.

We acknowledge that some of the *Banks* factors are not present in this case. Petitioner did not supply Stafford's lethal firearm. Nor does it appear petitioner was aware that Stafford was prone to deadly violence. Furthermore, given the brevity of Stafford's interaction with the victims, it does not appear petitioner was in a position to prevent the actual murder, and his actions did not play a particular role in Villavicencio's death.

16.

However, despite the absence of evidence on the foregoing factors, the remaining factors are sufficient to establish petitioner's role as a major participant in the offense. Petitioner had a role in planning the attempted robbery. Petitioner knew that Stafford did not have money to purchase marijuana and instead intended to rob R.R. Furthermore, petitioner admitted that he intended to aid and abet Stafford in this plan. He provided Stafford with his cell phone to communicate with R.R., accompanied Stafford to the restaurant parking lot, then waited with Stafford in the parking lot for 30 to 40 minutes for R.R. to arrive. Petitioner knew that the offense involved attempted robbery of a drug dealer, and we disagree with petitioner's suggestion that such offense may be characterized as a "garden variety robbery." (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1011 [characterizing the home invasion robbery of a drug dealer as "particularly risky," and not a "garden-variety robbery"].) Additionally, petitioner knew Stafford was armed with a loaded firearm. Petitioner was present at the scene of the killing. He brought his own loaded firearm to the attempted robbery and fired twice into the victims' vehicle. In other words, petitioner did not flee once the shooting started, but rather advanced on the victims' vehicle, shooting at it. This conduct suggests petitioner was not surprised by, but instead anticipated, the robbery's escalation to deadly violence. Petitioner then directed Stafford and Luisa to the nearby apartment, where he and Stafford worked to eliminate evidence of their involvement in the crime.

The foregoing evidence is sufficient to support the court's finding that petitioner was a major participant in the underlying robbery that led to Villavicencio's death.

### C.     Reckless Indifference

Petitioner contends substantial evidence does not support a finding that he acted with reckless indifference to human life. We conclude substantial evidence supports the court's finding.

There is substantial overlap between the evidence supporting the court's major participation finding and its reckless indifference finding. As with the *Banks* factors,

some of the *Clark* factors are not supported by the evidence. Specifically, it does not appear petitioner had an opportunity to restrain the killing during the relatively brief interaction between Stafford and the victims. And, again, the evidence does not suggest petitioner was aware that Stafford was prone to deadly violence.

However, petitioner made no effort to minimize the risk of violence prior to or during the attempted robbery. Petitioner knew that both he and Stafford were armed with loaded firearms, both of which were fired during the commission of the crime. Indeed, petitioner's presence at the scene and his firing of a gun into the victims' vehicle is the strongest evidence of his reckless indifference to human life. Petitioner was prepared to intervene, and did intervene, with violence in an effort to effectuate the attempted robbery. Although the evidence suggests petitioner began firing his weapon after Villavicencio was shot by Stafford, petitioner continued to fire in the direction of the victims as they fled.

Petitioner argues that his firing of a gun into the "vacated rear portion of the vehicle" shows that he intended only "to provide non-lethal cover fire for Stafford's escape." However, petitioner told law enforcement that he believed Stafford was the first to open fire. Petitioner also reported that he fired a warning shot into the air before firing into the vehicle, and he did not see anyone shooting from inside the vehicle or shooting at him. Petitioner's own statements belie the need to provide cover for Stafford, who petitioner observed to be the only aggressor in the encounter. Although the shots fired by petitioner ultimately proved nonlethal, his firing upon the victims' vehicle at close range as the victims attempted to flee constitutes substantial evidence of reckless indifference to human life. Our analysis is not altered by the fortuitousness of petitioner's poor aim.

Petitioner also contends that the remorse he expressed at sentencing reflects he did not want to kill the victim. However, petitioner's post hoc remorse or regret does not negate the mens rea he harbored at the time of the crime.

In sum, substantial evidence supports the court's finding that petitioner acted with reckless indifference to human life.  (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

## **DISPOSITION**

The order is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.